We'll hear in the next case on the calendar, Tricarico v. Colvin. Thank you. Good morning, your honors. May it please the court, my name is Christopher Bowes. I'm the attorney for the appellant Joseph Tricarico. I'd like to note that I've reserved two minutes of rebuttal time. This is a Social Security case in which Mr. Tricarico raises three arguments. First, that it was error for the administrative law judge not to afford controlling weight to the well-supported opinion of Mr. Tricarico's treating board-certified orthopedic surgeon, Dr. Weiland. Secondarily, the administrative law judge erred where the judge failed to properly credit Mr. Tricarico's subjective complaints of functional limitation in terms of sitting, standing, using his dominant right hand, and failed to fully consider all of Mr. Tricarico's complaints with respect to adverse side effects of medication. And lastly, at minimum, the court should find that the August 2013 report submitted to the Commissioner's Appeals Council addressing, by an orthopedist, addressing all of Mr. Tricarico's complaints, addressing all of the evidence that was before the administrative law judge, that it was error for the Appeals Council to conclude that that evidence was not new and material under the rubric of the regulation at 20 CFR 404970. First, Your Honors, the opinion of Dr. Daniel Weiland was improperly discounted in this case. Dr. Weiland had treated Mr. Tricarico for five years at the time of his June 2011 report. The ALJ, I understand that. He treated him for a long time. He had seen him, I think, every three months over a considerable period of time, treated him in a way that the record says was conservative. The ALJ doesn't have to give controlling weight when there's evidence on the other side to Weiland's opinion, does he? If there's evidence on the other side. Characterizing Dr. Weiland's treatment as conservative is not medical evidence. That's under the case of Shaw versus Cheadle. This court held that the administrative law judge cannot impose their concept of what type of treatment is necessarily required in a given situation. Isn't it true that many of Dr. Weiland's findings such that your client should avoid noise, fumes, gases, and dust, and that he was incapable of tolerating even low stress and can't lift even five pounds, they're not supported. Are they by any medical evidence or by your client's own testimony? Well, Dr. Weiland was treating his orthopedic injuries, right shoulder, lower back, cervical spine. Cervical spine was not considered by the administrative law judge properly. And he was treating him for pain. He was treating him with Vicodin and treating him with a muscle relaxant called Flexeril. And these conclusions that Dr. Weiland reached regarding stress and difficulty responding to environments that might further stress him are not unreasonable given Dr. Weiland's treatment. You know, there is the diagnosis of permanent disability and the recommendations for treatment, which are pain management and physical therapy. Yes. And, you know, why couldn't the administrative law judge say that even if Dr. Salen's opinions were not afforded great weight, that the problems in and of themselves with Dr. Weiland's reports provide the mismatch with the ALJ thought between the actual findings and the diagnosis and the actual treatment? Why isn't that enough for the ALJ to make a determination that Dr. Weiland should not be given great weight? Because that assessment, again, it's the ALJ's assessment of what type of treatment would be necessary and imposes too much of a light perspective on that opinion. That judgment would have to be, in the terms of this court, overwhelmingly compelling to undermine the opinion of a treating orthopedic surgeon. But he has Salen's testimony, does he not? He does, but he doesn't. Because if we adopted Dr. Salen's report, Mr. Tricharico could go back to work being a police officer, because Dr. Salen says he has no limitations in any area. Dr. Salen didn't have any of the MRIs of the lower back. He didn't have the MRI of the cervical spine. Dr. Weiland did. And there's a great difference between comparing those two reports. The regulations, it's an evidentiary rule that tells us to give greater weight to the opinion of a doctor who's treated you for a long period of time, who has a board certification, and who has considered the diagnostic tests that support the nature and the severity of the impairment. Dr. Weiland ordered all of those tests. He ordered physical therapy. He ordered pain management. He suggested to Mr. Tricharico that he undergo surgery for the right shoulder. It would have been the second surgery. And Mr. Tricharico sought the opinions of three other doctors. Dr. Allen, Dr. Babas, and Dr. D'Agostino all said you could have surgery on the shoulder, and they went over the risks and benefits of having that surgery. But he chose not to have the surgery. There's nothing in the record shows that having the surgery would clearly restore function. And so he's left with a bad dominant right arm, which isn't fully considered by the administrative law judge in his decision in terms of reaching and handling. Something I'm not clear about is this. If you look at Dr. DeFeo's multiple impairment questionnaire, it doesn't specify any of Dr. Weiland's recommendations. And Dr. DeFeo says that your client was capable of tolerating moderate stress. But you're arguing that the appeals counsel should have incorporated Dr. DeFeo's findings. But aren't they in conflict with Dr. Weiland's? Not necessarily, Your Honor. I think that's a side issue about the ability to handle stress in a work environment. And, you know, if Dr. DeFeo reached a slightly different opinion than that of Dr. Weiland, I don't see that as a substantial issue. The real issue is the ability to use hands for manipulation. Dr. DeFeo agreed that he would have difficulty, marked difficulty, using his hands for fine manipulations and for reaching, grasping, turning, and twisting. In the dominant right arm, it's essentially precluded. That's more or less what Dr. Weiland considered, and the judge doesn't address this. The judge doesn't address the subjective complaints of pain that Mr. Trocarico raises. He doesn't address his 23-year work history, 17 years as a police officer. He took care of a household of three young children during the period when his wife worked. I understand there was a period when she didn't, but there is a period when she worked, and apparently he was maintaining a household, perhaps shopping. I don't remember exactly whether they listed shopping, but taking care of children. Doesn't that indicate, doesn't that give some reason not to give controlling weight? Remember, we're not talking about giving no weight. We're talking about not giving controlling weight to a doctor who said he was totally disabled. Understood. I think the record shows that for a very short period of time, September and October of 2012, Mr. Trocarico's wife went back to work part-time from 8 to 1. So she was out of the household at that point in time. He testified that she took the two boys to the bus, and he watched the daughter while she went to work, and then maybe later on he would take the son, one son, to school. So he wasn't watching all three children at one time. And from 2010 until September 2012, his wife was home in the household handling most of those ADLs, and so we submit that it's a slim read to judge Mr. Trocarico's whole case on. It was part-time, and it wasn't a substantial amount of work that demonstrates the ability to perform sustained work activity. If I don't have any more questions, I'll reserve my time for rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Robert Shriver on behalf of the Commissioner of Social Security. The claimant in this case retired from the New York City Police Department after being approved for a disability pension for which he applied, and his last day of work was October 30, 2010. Mr. Trocarico, who was 40 years old at that time, retired after having worked on light or restricted duty for nearly three years at that point. And the evidence in this case clearly establishes that Mr. Trocarico could not have performed his previous job as a police officer or police sergeant, but the issue in this case and what the ALJ addressed is whether or not he was able to perform any other work that existed in significant numbers in the national economy. And the ALJ correctly found that Mr. Trocarico was able to perform a range of sedentary work and thus was able to perform other work in the national economy. Can I draw your attention to the Seventh Circuit's Judge Posner decision in Bjornsson v. Astrew? And several other circuits have picked up, as you know, on Judge Posner's decision. And the question is how you do the RFC assessment and whether, in fact, the ALJ says explicitly that he found Trocarico's testimony, claims in his testimony, and I quote, not credible to the extent that they are inconsistent with the above residual functional capacity. And Judge Posner says that this gets it backwards. Could you tell me your views in response? Your Honor, I think that the ALJ's statement that Mr. Trocarico is not credible to the extent that it did not agree with the RFC evaluation is it's not putting the cart before the horse, but simply a summation of why the ALJ found that he was not completely credible. In other words, that he was not, in fact, completely disabled as he alleged. So do you agree that the ALJ should first determine the extent to which claimant's systems are credible in light of the, I'm quoting from another decision, in light of the objective record evidence and then use that finding as one aspect of the RFC analysis? Do you agree that that's how it should be done? I do agree with that, Your Honor, and that's what the ALJ did in this case. The ALJ specifically took into account Mr. Trocarico's testimony regarding the side effects of his medication when he stated that he had difficulty concentrating, that he was drowsy, that he was somewhat fatigued, and that's on page 27 of the administrative record, which is page 7 of the ALJ's decision. The ALJ states that he limited Mr. Trocarico to simple and repetitive work based on his testimony, that he had medication side effects that included diminished concentration. So the ALJ specifically took his testimony into account where he found it credible and incorporated that into the RFC finding. And that's where obviously your adversary disagrees. Your adversary says that those kinds of issues like drowsiness and dizziness were not part of the RFC assessment. And I disagree with that as well based upon the language in the judge's decision just quoted. Mr. Trocarico, when he testified, he specifically stated that the drowsiness and lack of concentration were based on side effects from his medication. The ALJ did consider that, and, in fact, the ALJ took it into account in his decision and modified the RFC accordingly. To address the ALJ gave limited weight to Dr. Weiland's opinion. The opinion could not have been given controlling weight because it was contradicted by not only other opinion evidence from medical sources in the record, but also because of Mr. Trocarico's rather extensive activities of daily living. First of all, Dr. DeAngelo wrote in July of 2010 that when Mr. Trocarico was still working, that he was able to work on this restricted duty or light duty, even though he was not fit for regular police duty. Dr. Salen, who we've mentioned before, also examined Mr. Trocarico after he stopped working and made mostly normal examination findings and opined that he had no limitations in sitting or standing in direct contradiction of Dr. Weiland's opinion. And Dr. Germino, who was the chiropractor that Mr. Trocarico saw, noted in January of 2012 that he was able to stand for long periods, quote-unquote, and to sit continuously. Dr. Weiland also, I would like to note, stated in July of 2010, and this is when Mr. Trocarico was still working but applying for a disability pension, Dr. Weiland stated that he was, quote, totally disabled, quote-unquote, despite the fact that Mr. Trocarico was working 40 hours a week at that time and earning a substantial amount of income. Regarding his activities of daily living, Mr. Trocarico stated when he applied for benefits back in April of 2011, that in a typical day, he engaged in light exercises, he made meals for himself and his son, he supervised his children, he helped with basic cleaning, household work, he went outside often, he drove, drove a car, he went shopping once a week, he attended church, he visited his relatives, he went out to dinner or to parties with friends and family, he took his son to school, he took his son to physical therapy, he took his son to doctor's appointments. I list all of these things to make it clear that he was able to perform a wide range of functions. And these are important and the LJ took note of these because this is not a doctor's opinion as to what Mr. Trocarico would be able to do if he were to seek work. This is evidence of what he actually did. This is what he was doing, what he was able to do. And it is flatly contradictory of the restrictions that are given in Dr. Weiland's opinion. And it was given little weight for that additional reason, not just for his treatment history, not just for the fact that it was contradicted by other doctors, and not just for his activities of daily living, but all of those factors together, the ALJ considered to find that Dr. Weiland's opinion was not entitled to significant weight. Regarding the... What about the good work history argument? The good work history. Now, good work history is a factor that can be considered in the credibility analysis. It is, however, under Second Circuit precedent, only one factor. Is there any evidence that the ALJ noted, I mean, that the ALJ took into account the good work history here? Well, the ALJ was clearly aware of Mr. Trocarico's work history. It's mentioned on virtually every page of his decision, the fact that he used to be a police officer with rather significant work duties, rather strenuous work duties. And the contrast between... Does he have to talk about good work history as opposed to just noting the history? I do not think there's a hard and fast requirement that the ALJ must say he has a good work history, therefore this is a point in his favor in terms of credibility. And in this case, there are other points against his credibility, mainly the large activities of daily living that I have already noted won't go through again. In addition, the ALJ also took into account some of his testimony regarding his need to sit and stand at will, his inability to sit constantly for, say, six hours a day, the side effects of his medication, and he took into a large account what Mr. Trocarico stated that he was able to do. To say simply that the ALJ ignored his prior work history is inaccurate. To say that the case should be remanded simply because he wasn't given more credit for having a good work history, I also think is not warranted, particularly given the facts of this case. If I could, I would briefly address Dr. DeFeo's report. Two reports, actually, that were submitted to the Appeals Council. The Appeals Council found that they postdated the date of the ALJ's decision. This is correct. Dr. DeFeo did not examine Mr. Trocarico until July of 2013, which is approximately eight months after the ALJ's decision was given. This was a one-time examination. He had not seen him before. The first examination report that he gave is based only upon his findings made that day of Mr. Trocarico and his one-time examination. The questionnaire that he submitted as to Mr. Trocarico's work abilities also would not have been considered new, properly was not considered new in material evidence because the extreme limitations that Dr. DeFeo specifies would have been rejected for the same reasons that the ALJ rejected Dr. Weiland's opinions in his questionnaire. Unless the Court has any further questions, I see my time is almost up. Thank you. Thank you, Your Honor. Your Honor, I'd like to point out that in discussing the dizziness and the tiredness, I become drowsy. This is at page 47 of the record. Without the medication, he's in a lot of pain. He's also in pain at night, and that wakes him up. And due to that, and presumably the medication as well, he takes daytime naps. How many times do you take a daytime nap? Every day. That's at transcript page 48, 49 of the record. With respect to the concept that Mr. Trocarico is at home doing exercises, the only part of the record that discusses that is where he says he engages in therapeutic exercises and puts hot packs and cold packs on his body as part of the home treatment prescribed by Dr. Weiland. Could you respond to your adversary's view as to whether the ALJ got it right with respect to the RFC and the assessment of credibility? Well, we can read the decision ourselves and see exactly where the judge's rationale is. The judge is saying, I've considered the RFC assessment, and then separately I've considered the credibility, and I'm rejecting it because it's inconsistent with the RFC assessment that I've established. Now, that's what he's writing in his decision. That's what Mr. Trocarico is entitled to believe that the judge's rationale is. There's nothing else exhaustively explaining how the judge went through the required elements of the credibility assessment at 20 CFR 404-1529. It's an exhaustive process that the judge is supposed to go through. And the problem with the boilerplate throwaway language that we see here is that too often it's been accepted as a way to dispose of what should otherwise be an arduous and detailed and specific credibility assessment that is absent here and takes into account an individual's long work history like Mr. Trocarico. Your time is up. I just wanted to point out that Dr. Germino in January of 2012, in fact, says that standing for long periods of time can be managed alone despite marked pain, and that's at 45-46, and that sitting continuously can be done with some difficulty because of pain. Thank you. Thank you for your argument.